**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **ONSLOW ROSS,** | : | |
| | : | |
| **Petitioner,** | : | |
| | : | |
| **VS.** | : | **NO. 5:07-CR-77 (CAR)** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | **Proceeding under 28 U.S.C. § 2255** |
| **Respondent.** | : | **Before the U. S. Magistrate Judge** |
| _____ | : | |

## RECOMMENDATION

Before the Court is Petitioner Onslow Ross's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255. Doc. 99. Plaintiff was convicted of bank fraud and over fifty (50) counts of money laundering, and was sentenced to 130 months in prison. In his motion, Petitioner has made seven claims of ineffective assistance of trial or appellate counsel. Petitioner claims his counsel was ineffective for: 1) failing to argue to the Eleventh Circuit that the decision in United States v. Santos applied retroactively and that the evidence at trial was insufficient to show the funds deposited were "proceeds" as defined by Santos; 2) failing to address the sufficiency of the evidence as to the bank fraud and money laundering charges; 3) failing to present an insurance and mortgage expert at trial; 4) failing to advise petitioner of the full risk of testifying at trail; 5) failing to object to trial court's instruction that "Defendant presented the check from Alfa Insurance Company;" 6) failing to compel witness Josh Jones to submit to a handwriting sample; and, 7) failing to raise an objection to the trial court's four-point sentencing enhancement on appeal. For the following reasons, it is hereby **RECOMMENDED** that Petitioner's motion be **DENIED**

## BACKGROUND

1. **Course of Proceedings**

On January 16, 2008, a fifty-eight count superseding indictment was returned in this Court against Petitioner Onslow Ross. Doc. 32. Count One of the indictment charged Petitioner with bank fraud in violation of 18 U.S.C. § 1344. Specifically, Count One alleged that Petitioner, aided and abetted by others, engaged in a fraudulent scheme in which he wrongfully disposed of the proceeds of an insurance check. The scheme alleged in the indictment was that Petitioner obtained an insurance proceeds check from Alfa Insurance Company made payable to Reaching Souls Cathedral of Praise Apostolic Church and CB&T Bank, and presented the insurance check with a forged signature of CB&T to Security Bank for deposit in the newly created Reaching Souls Cathedral of Praise Construction Account. The indictment further alleged that Petitioner withdrew money from the new account at Security Bank using cashier's checks made payable to various individuals.

Counts Two through Ten charged Petitioner with engaging in monetary transactions in property derived from the bank fraud alleged in Count One, in violation of 18 U.S.C. § 1957. Counts Eleven through Fifty-Six charged Petitioner with the laundering of monetary instruments through transactions "designed to conceal and disguise the nature, location, source, ownership, and control of the proceeds" of the bank fraud, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Doc. 32. Counts Fifty-Seven and Fifty-Eight brought criminal forfeiture claims under 18 U.S.C. § 982.

Petitioner was tried from March 3, 2008 to March 10, 2008. Docs. 79-84. The jury returned guilty verdicts convicting Petitioner of counts One, Two, Four through Forty-Two, and Forty-Four through Fifty-Six. Doc 84. The Special Verdict form submitted to the jury found that

the property identified in the forfeiture count was not property derived from the proceeds of the charged violations. On June 3, 2008, Petitioner was sentenced based on a sentencing guideline range of 130-162 months. The Court sentenced Ross to 130 months of imprisonment, to be followed by five years of supervised release. Doc. 92.

Petitioner filed a timely appeal, and his conviction was affirmed by the United States Court of Appeals for the Eleventh Circuit on April 16, 2009. United States v. Ross, 323 F.App'x 773 (11th Cir. 2009); Doc. 95. On appeal, Petitioner challenged his bank fraud and money laundering convictions, based on four claims of error: (1) violations of his Sixth and Fourteenth Amendment rights by the court's failure to properly instruct the jury when a petit juror was replaced by an alternate, (2) violation of Federal Rule of Criminal Procedure 31(d) by refusing to poll the jury for a second time, (3)failure to limit the jury's consideration of Petitioner's prior criminal conduct, and (4) failure to correctly apply the Supreme Court of the United States' decision in United States v. Santos, 553 U. S. 507 (2008). Doc. 99.  After his unsuccessful appeal, on July 8, 2010, Petitioner filed the present Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255. Doc. 99.

## 2.  **Factual Background**

Trial of Petitioner's case took place over six days.  The Government presented its case in chief over two days, calling twelve witnesses.  The defense case took two more days, and Petitioner's counsel called thirteen witnesses.  Defendant also testified on his own behalf.  Both parties presented rebuttal or sur-rebuttal witnesses.  The jury deliberated for approximately two days before returning a verdict.  The substance of the Government's evidence and of the defense evidence is outlined below.

A. **The Government's case**

At the time of the events in question in this case, Petitioner Onslow Ross was the pastor of Reaching Souls Cathedral of Praise Apostolic Church (the Church) in Macon, Georgia. Doc. 81 at 167. In April 2005, Petitioner had Alfa Insurance Company write an insurance policy on the Church property, providing coverage from April 15, 2005 to April 15, 2006. Doc. 79 at 32, 34. Petitioner himself provided the information for the policy application.  Doc. 79 at 34.  The insurance policy included coverage on the Church's sanctuary building, in the amount of three hundred eighty-nine thousand dollars ($389,000) in actual cash value rather than replacement costs. Doc. 79 at 35-36.

On the insurance application, Petitioner, represented that there was a mortgage on the entire church property, but could not recall the name of the mortgagee. Doc. 79 at 34-35. Petitioner was later notified that CB&T Bank had been added to the insurance policy as the mortgagor and that CB&T would receive a copy of the insurance policy. Doc. 79 at 47. CB&T maintained that the mortgage, in the amount of $520,000, was on the entire church property covered by the insurance policy. Doc. 80 at 25. CB&T later learned, however, that its deed to secure debt had been filed on only one portion of the property. Id.

On May 22, 2005, the roof of the Church's sanctuary collapsed. Doc. 79 at 42; Doc. 81 at 10. A building contractor testified the roof collapsed due to a failed truss system and a possibly failed wall system. Doc. 81 at 7. The mortgage broker at CB&T only then learned of the Alfa insurance policy and contacted Alfa Insurance Company requesting that the insurance proceeds be sent to CB&T. Doc. 79 at 96. CB&T also notified Petitioner that it would be seeking the insurance proceeds. Doc. 79 at 97. On August 23, 2005, Alfa Insurance Company issued the

4

insurance proceeds check made out to both the Church and CB&T for the amount of $389,000. Doc. 79 at 59. The check was given to Petitioner, who shortly thereafter returned to Alfa Insurance Company requesting that the proceeds from the check be split into separate checks so the Church could obtain the money without having to go through CB&T. Doc. 79 at 62. Alfa Insurance Company informed Petitioner that the check could not be split and that Petitioner would have to take the check to CB&T. Doc. 79 at 62.

Steve Williams, a vice president at CB&T, testified that he learned that Alfa had issued a check during a telephone conversation with Alfa's agent Steve O'Quinn on August 23, 2005, the day the check was issued.  Doc. 79 at 98.  When he learned that Alfa had issued a check, Williams immediately called Petitioner to ask when Petitioner was planning to bring the check to the bank.  Doc. 79 at 99.  According to Williams, Petitioner denied any knowledge of the check and then complained that the insurance company was not supposed to tell the bank about the check. Id.

On August 31, 2005, Petitioner and fellow Church members Undre Williams and Willie Ross set out to cash the check. Doc. 81 at 73. Petitioner first went to Magnolia State Bank in Macon to deposit the check, but Magnolia State Bank refused to accept the check for deposit because there was no endorsement from payee CB&T on the check. Doc. 81 at 74, 184. Petitioner then went to a branch of Security Bank in Macon and met with Security Bank employee Josh Jones to open a construction account and deposit the check into that account. Doc. 79 at 68; Doc. 81 at 184. After opening the construction account, Petitioner accompanied Jones to the teller window to deposit the check into the newly formed account. Doc. 79 at 68; Doc. 81 at 184. Jones handed the check to the teller for deposit, and the deposit slip was given to

Petitioner. Doc. 81 at 188. When the check was deposited, it contained the signature of both the Church and CB&T bank. Doc. 81 at 109. While Church member Undre Williams stated he signed the check for the Church, it was never determined who forged the CB&T signature. Doc. 79 at 68, Doc. 81 at 109-115.

Soon after the check cleared, Petitioner began moving the money. Charles Blankenship, a fraud investigator for Security Bank, testified that on September 9, 2005, exactly ten days after the check was deposited and the day the check cleared, a Security Bank certified check in the amount of $49,000 made payable to Willie Ross was taken from the account. Doc. 80 at 46. Bradford Prossor testified that on the same day, September 9, a Security Bank cashier's check made out to Willie Ross was presented to Magnolia State Bank.  Doc. 80 at 65.  From that check, $46,000 was deposited into the account of Reaching Souls Learning Center, $3,000 in cash was taken out. Doc. 80 at 65. The same account had as little as $130.58 in April of 2005. Doc. 80 at 63. Prossor testified that several cash withdrawals and cashier checks were taken out of the Magnolia State Bank account, and the Government presented ten canceled checks taken out of that account over the next two weeks. Doc. 80 at 66-70. These checks, totaling over $40,000, were made out to Church members, automotive dealerships, and loan companies.

In addition to evidence of the $49,000 initially deposited or cashed at Magnolia State Bank, the Government presented evidence that $337,000 was deposited into the BB&T Bank account of Petitioner's grandmother, Rosa Mae Ross, in September and November 2005.  On September 9, 2005, a Security Bank cashier's check for $40,000, made out from Willie Ross to Willie Ross, was deposited into Mrs. Ross' account.  Govt. Ex. 9.  On September 19, 2005, a Security Bank cashier's check for $100,000, made out from Reaching Souls Cathedral of Praise

to Rosa Ross, was deposited into Mrs. Ross' account.  Govt. Ex. 10.   On September 19, 2005, a
Security Bank cashier's check for $197,000, made out from Reaching Souls Cathedral to Rosa
Ross, was deposited into Mrs. Ross' account.  Govt. Ex. 13.  Mrs. Ross testified that she did not
know the source of that money. Doc. 80 at 115, 118. The Government submitted stills from
video cameras at Security Bank showing Willie Ross and Petitioner making transactions on
September 9 and September 19, 2005.  Govt. Exs. 58, 59.

Rosa Mae Ross testified about multiple deposits and withdrawals from her bank account
involving tens of thousands of dollars, almost all of which she had no knowledge. Doc. 80 at
110-30. Using bank records, canceled checks, and credit card statements, the Government went
through the expenses from Mrs. Ross' account in detail.

As one example of the expenses from the BB&T account, the Government showed that
an official check was issued from Mrs. Ross' account to Platinum Automotive, on October 7,
2005, in the amount of $42,000.   Govt. Ex. 14. Mrs. Ross testified that she did not know
anything about that check. Doc. 80 at 120. Rodney Jackson, from Platinum Automotive, testified
that Petitioner purchased a 2002 BMW 745 on October 7, 2005, with a check for $42,000.  Doc.
80 at 170-71. The Government presented evidence that two other checks were issued to Platinum
Automotive, in the amount $5,000 each, as payments for other vehicles previously purchased.

As another example of the expenses from Mrs. Ross' account, the Government presented
evidence that funds from the account were used to pay the bills for credit cards. Mrs. Ross
testified about two credit card accounts in her name that Petitioner used to purchase thousands of
dollars' worth of merchandise. Doc. 80 at 131-58. The Government played an audio recording of
Petitioner impersonating his grandmother to obtain one of those credit cards, an American

Express card. Doc. 80 at 159. The Government submitted statements to show that the card were used to pay a number of expenses for Petitioner, including expenses for travel, clothing and shoes, furniture, jewelry, and a fur coat.  Govt. Exs. 37-41. Mrs. Ross denied specific knowledge of the expenses, but explained that Petitioner used the card to pay Church expenses and for travel on behalf of the Church.

### B.  The Defense case

Petitioner's trial counsel presented a defense based on the theory that Petitioner acted in good faith and did not have the requisite criminal intent to commit the crimes charged in the indictment. Petitioner maintained that the Church decided to deposit the insurance proceeds check without CB&T's consent because they believed that CB&T did not have a mortgage on the property covered by the insurance policy. To bolster this defense, Petitioner's trial counsel presented the testimony of fourteen witnesses, including a title expert, a handwriting expert, multiple Church members, and Petitioner himself.

Defense witnesses testified that after the roof of the Church's sanctuary collapsed, Church members Xavier Cross and Willie Ross (Petitioner's father) went to the Bibb County Courthouse to find out who built the Church. Doc. 81 at 10-15. While at the courthouse looking at titles and land plats, Cross discovered that the Church was located on two separate tracts of land, 5555 Bethesda Avenue (Bethesda Avenue) and 2515 Rocky Creek Road (Rocky Creek Road). Doc. 81 at 20. Cross also discovered that there was no deed to secure debt on the Rocky Creek Road tract. A title expert testified for the defense and verified that there were in fact two separate tracts and that the deed to secure debt was only attached to the Bethesda Avenue tract. Doc. 81 at 44-47.

Three to four weeks later, Cross met with the Church's executive board, consisting of eight members, including Petitioner. The executive board reached a consensus that there were two separate pieces of property and that the damaged sanctuary was on Rocky Creek Road, which was covered by the insurance policy but did not have a mortgage lien from CB&T. Based on this consensus, the board decided that the insurance proceeds belonged to the Church and "not to anybody else." Doc. 81 at 27. The board then decided to retain the check from Alfa and to deposit it into the Church bank account without giving any money to CB&T. Doc. 81 at 27-33, 70-72, 126-27. Undre Williams signed the check on behalf of the Church, and Williams, Petitioner, and the elder Ross went to deposit the check. Doc. 81 at 27-28, 72-73.

After being turned away at Magnolia State Bank, the three men went to Security Bank to deposit the check. Doc. 81 at 183-84. While Petitioner denied personally depositing the check, Petitioner confirmed that he was at the counter with Josh Jones when the check was deposited and received the deposit slip. Doc. 81 at 188. Petitioner and Williams denied signing CB&T's signature on the check. Doc. 81 at 76, 188.

To testify about the signatures on the check, Petitioner called Ferrell Shiver, a forensic documents examiner and handwriting identification expert. Doc. 81 at 105. Shiver examined the endorsements on the insurance check and concluded that Undre Williams had signed the Church's name on the back of the check. Doc. 81 at 110-12. Shiver also testified that it was highly probable that Petitioner, Undre Williams, and Lucille Davis did not write the signature for CB&T on the back of the check, and that Rosa Mae Ross (Petitioner's grandmother) was probably not the writer of CB&T's signature. Doc. 81 at 112-15. Josh Jones refused to submit to a handwriting sample. Doc. 79 at 90.

Once the check cleared, Petitioner testified that the church executive board decided to move the money from the Security Bank account into the Church's Magnolia State Bank account because they were afraid that CB&T would seize the funds. Doc. 81 at 190-92. Some of the money was then moved from Magnolia State Bank into Rosa Mae Ross's BB&T Bank account. Doc. 81 at 192. Petitioner also obtained a credit card in his grandmother's name with the funds. Doc. 81 at 205. The money was then used to help rebuild the Church, to obtain another loan for the Church, to pay for general Church expenses, to pay for trips to preach at other churches in Buffalo, New York, and to pay Petitioner's home mortgage. See generally Doc 81. Petitioner's home mortgage was paid because the Church planned to turn Petitioner's home into a parsonage. Doc. 81 at 203. Petitioner called several witnesses to testify about how the money was spent, including Petitioner, church members Lucille Davis and Xavier Cross, and Jeanette Davis, the National Mother of the ministry whose church was located in Buffalo. Doc. 81.

Based on this evidence, Petitioner contended that he acted in good faith based on his belief and the Church board's conclusion that CB&T did not have a right to the proceeds from the insurance policy.  Petitioner's trial counsel noted that there was no evidence that Petitioner or any member of the Church had forged the endorsement of CB&T on the check and suggested that Josh Jones at Security Bank may have added the endorsement.  Petitioner further contended that he had acted in good faith by spending all the proceeds for the benefit of the Church.  At Petitioner's request, the trial court presented an adapted charge on good faith, stating that good faith was a "complete defense" and that the Government had the burden of proving that the defendant had the specific intent to defraud as charged in the indictment.  Doc. 82 at 156-57.

## DISCUSSION

All of Petitioner's grounds for relief in this case are based on claims of ineffective assistance of counsel. Doc. 99. The Sixth Amendment of the United States Constitution states that "in all criminal prosecutions, the accused shall enjoy…the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel provision provides the accused the right to effective assistance of counsel. McMann v. Richardson, 397 U.S. 759, 771, n. 14 (1970). To prevail on a claim of ineffective assistance of counsel, the petitioner bears the burden of establishing by a preponderance of the evidence that: 1) his attorney's performance was deficient, *and* 2) he was prejudiced by the inadequate performance. Strickland v. Washington, 466 U.S. 668, 687 (1984); Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000). A petitioner must prove both prongs of the Strickland test to show his counsel was ineffective. Id.

To establish deficient performance, a petitioner must prove that his counsel's performance was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. Chatelain v. Singletary, 89 F.3d 749, 752 (11th Cir. 1996). A strong presumption exists that the counsel's performance was reasonable and the challenged action constituted sound trial strategy. Id. In order to establish counsel's performance was unreasonable, a petitioner must show that no objectively competent counsel would take the action in question. Van Poyck v. Florida Department of Corrections, 290 F.3d 1318, 1322 (11th Cir. 2002).

To establish prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's inadequate representation, the outcome of the proceedings would have been different. Strickland, 466 U.S. at 697; Meeks v. Moore, 216 F.3d 951, 960 (11th Cir. 2000).

Reasonable probability is defined as a "probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694). If a petitioner fails to prove that he has suffered prejudice, the court need not address the deficient performance prong of the Strickland test. Holiday v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000).

The right to effective assistance of counsel applies equally to counsel on appeal of right as it does to trial counsel. Evitts v. Lucey, 469 U.S. 387, 396 (1985). The Eleventh Circuit has held that the Strickland standard applies to ineffective assistance of appellate counsel claims. Heath v. Jones, 941 F.2d 1126, 1130 (11th Cir. 1991). Thus, to prevail on a claim of ineffective assistance of appellate counsel, a petitioner must show that his appellate counsel's performance was deficient and that the petitioner was prejudiced by the performance. Id. Further, counsel cannot be found ineffective for failing to raise every non-frivolous defense. Chandler, 218 F.3d at 1319. Counsel must use his or her judgment to determine which claims and arguments to emphasize, which may require counsel to rule out other non-frivolous claims and arguments. Id.

Petitioner has requested an evidentiary hearing in this matter. Doc. 108 at 20. Petitioner has the burden to establish the need for an evidentiary hearing, and the Court is not required to hold an evidentiary hearing where the record makes "manifest the lack of merit of a Section 2255 claim." United States v. Lagrone, 727 F.2d 1037, 1038. (11th Cir. 1984). As explained below in addressing each of Petitioner's grounds for relief, the files and records in this case are sufficient to show that Petitioner's claims are without merit, and no evidentiary hearing is necessary.

1.  **Whether appellate counsel was ineffective for failing to argue that the evidence at trial was insufficient to show the funds deposited were "proceeds" as defined by the Supreme Court in <u>United States v. Santos.</u>**

Three months after the trial in this case, the United States Supreme Court issued its opinion in the case of <u>United States v. Santos</u>, 553 U.S. 507 (2008). In <u>Santos</u>, Justice Scalia, writing for a plurality of the Court, determined that the term "proceeds" in the federal money-laundering statute (18 U.S.C. § 1956) referred to "profits" rather than receipts. Petitioner's appellate counsel raised <u>Santos</u> on appeal. In its opinion affirming the conviction, the Eleventh Circuit interpreted Petitioner's argument as a claim that the trial court erred in its instructions to the jury, and addressed the argument in a single paragraph:

> Relying on <u>United States v. Santos</u>, --- U.S. ----, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008), Ross asserts that the district court should have instructed the jury that "proceeds," as that term is used in the money-laundering statute, means "profits," not "receipts." But <u>Santos</u> was decided nearly three months after Ross's jury trial ended. Therefore, any error was not plain under current law; and we reject this argument. <u>See</u> <u>United States v. Olano</u>, 507 U.S. 725, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993) (explaining that, to establish that an error was plain, appellant must show that the error was "plain," "clear," or "obvious" under current law).

<u>United States v. Ross</u>, 323 Fed. Appx. 773, 775 (11th Cir. 2009).

Now, in his 2255 Motion, Petitioner argues that his appellate counsel was ineffective for failing to argue or to make clear that <u>Santos</u> affected not the jury instructions but the sufficiency of the evidence to support Petitioner's convictions. Petitioner contends that the funds from the Alfa insurance check were not "proceeds" as defined by the plurality in <u>Santos</u>, and therefore that the subsequent transactions proved by the Government could not have been found to be money laundering under 18 U.S.C. § 1956 or 1957. Because this argument is without merit and would not have changed the outcome of Petitioner's appeal, Petitioner cannot show that he was

prejudiced by his counsel's failure to address the effect of <u>Santos</u> on the sufficiency of the evidence.

Petitioner's sufficiency of the evidence argument is without merit because the proceeds of the insurance check distributed by Petitioner amount to "profits" under the definition of "proceeds" described by Justice Scalia in <u>Santos</u>.[1] To prove money laundering under 18 U.S.C. § 1956 or 1957, the Government must show that a defendant engaged in transactions involving "proceeds of specified unlawful activity." 18 U.S.C. §§ 1956(a), 1957(f)(2). In his plurality opinion, Justice Scalia determined that the term "proceeds" must refer to "profits," not to mere "receipts."  To show that a defendant profited from a criminal activity, the prosecution must show that "the receipts from the charged unlawful act exceeded the costs fairly attributable to it." <u>Santos</u>, 553 U.S. at 520.  To establish that a defendant profited, "the prosecution needs to show only that a single instance of specified unlawful activity was profitable and gave rise to the money in the charged transaction." <u>Santos</u>, 553 U.S. at 520.

The <u>Santos</u> case specifically involved the laundering of money obtained from operating an illegal lottery. The narrow holding of <u>Santos</u> was that the "proceeds" from that operation did

---

[1] It is not clear that the definition of "proceeds" from Justice Scalia's opinion would be binding in this case. The Eleventh Circuit has held that that <u>Santos</u> must be narrowly construed to its specific context, the context of a gambling operation. <u>United States v. Demarest</u>, 570 F.3d 1232, 1242 (11th Cir. 2009). When a fragmented Court decides a case and no single rationale explaining the decision is agreed upon by five Justices, the holding of the Court is viewed as the position upon which at least five Justices concurred on the narrowest ground. <u>Demarest</u>, 570 F.3d at 1242. The Eleventh Circuit concluded that the "narrow holding in <u>Santos</u>, at most, was that gross receipts of an *unlicensed gambling operation* were not 'proceeds' under section 1956." <u>Demarest</u>, 570 F.3d at 1242. (emphasis added). Accordingly, the holding of <u>Santos</u> does not apply in Petitioner's case, which does not involve the laundering of funds derived from an unlicensed gambling operation. The Court notes that in 2009 Congress clarified the definition of "proceeds," revising 18 U.S.C. § 1956 to include "gross receipts." See <u>Pub.L.No.</u> 111-21, § (2)(f)(1) (May 20, 2009).

not include the payouts given to winning bettors, which were described as "expenses associated with the commission of the crime." 553 U.S. at 516.  The payouts to the winners were part of the original crime of illegal gambling and could not be considered money-laundering transactions. The "proceeds" or "profits" of the activity were simply the funds remaining after the lottery winners had been paid.

In this case, the entire amount of the insurance check constituted profits or proceeds of the bank fraud.  There was no evidence at trial to indicate that Petitioner incurred expenses associated with the commission of the fraud.  The transactions described at trial all took place after the check was deposited and had nothing to do with the act of depositing the check.  Even if the Court believes Petitioner's assertion that none of the $389,000 was used on personal expenses[2], the proceeds of the check were profits under the <u>Santos</u> definition.

The essence of the money laundering charge is that Petitioner took money obtained from a criminal action and engaged in transactions to conceal the source of the money (18 U.S.C. §§ 1956(a)(1)(B)(i)) or engaged in transactions with financial institutions involving a value greater than $10,000 (18 U.S.C. §§ 1957).  Because the evidence in this case was sufficient to show that Petitioner engaged in such transactions with the funds he obtained by depositing the insurance check, he was not prejudiced by his appellate counsel's failure to argue that the <u>Santos</u> decision affected the sufficiency of the evidence.

---

[2] The Government presented substantial evidence to indicate that much of the money was spent on personal expenses.

**2. Whether appellate counsel was ineffective for not addressing the sufficiency of the evidence as to the bank fraud and money laundering charges.**

The record in this case fails to support Petitioner's claim that appellate counsel was ineffective for failing to raise the sufficiency of the evidence as to the bank fraud and money laundering charges. Because there was ample evidence to support the jury's verdict, Petitioner cannot show that he was prejudiced by his appellate counsel's decision.

If appellate counsel had raised the sufficiency of the evidence argument on appeal, the Eleventh Circuit would have reviewed the error *de novo*, "viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." United States v. Taylor, 480 F.3d 1025, 1026 (11th Cir. 2007). The evidence is sufficient as long as a reasonable jury could find guilt beyond a reasonable doubt. United States v. Arbane, 446 F.3d 1223, 1226 n.1 (11th Cir. 2006).

Petitioner contends that the evidence at trial was insufficient to convict him of bank fraud and money laundering because a reasonable jury could not have found Petitioner to have the requisite criminal intent. Doc. 99 at 39, 48. The bank fraud statue, 18 U.S.C. § 1344, requires the government to show specific intent to defraud. United States v. Goldsmith, 109 F.3d 714, 716 (11th Cir. 1997). Intent or knowledge is also required under both the money laundering statute, 18 U.S.C. § 1956, and the money transactions in property statute, 18 U.S.C. § 1957. Intent or knowledge can be proven by circumstantial evidence, including inference drawn from the conduct of the alleged guilty party. See United States v. Silvestri, 409 F.3d 1311, 1328 (11th Cir. 2005).

At trial, the evidence presented was more than sufficient to lead a reasonable jury to conclude that Petitioner had the requisite criminal intent on all the counts for which he was convicted. Although Petitioner presented testimony conflicting with some of the Government's evidence, the evidence must be construed in favor of the verdict. Petitioner's "good faith" defense was particularly a matter for the jury's consideration, as it involved questions of the credibility of Petitioner's witnesses and of his subjective intent.

Petitioner's actions themselves are sufficient to support an inference that he acted with criminal intent and that his claim of good faith was not credible.  The Government's evidence showed that Petitioner was given an insurance proceeds check for $389,000 made out to both the Church and CB&T. Doc 79 at 99. Petitioner never attempted to take the check to CB&T. Doc. 79 at 99. Before attempting to negotiate the check, Petitioner asked Alfa Insurance Company to split the check so that the Church could obtain the money without going through CB&T, but Alfa refused. Doc. 79 at 62. When contacted by CB&T about the check, Petitioner denied knowing of its existence. Doc. 79 at 99. Petitioner then attempted to deposit the check at not one, but two separate banks without consulting with CB&T. Doc. 81 at 73-75, 184-84. The first bank refused to accept the check without an endorsement from CB&T.  At the second bank, the check was presented with a forged endorsement.  After depositing the check, Petitioner removed the funds and distributed the money into a Magnolia State Bank account, Petitioner's grandmother's bank account, cashier's checks, personal checks, automobile payments, mortgage payments, and credit card payments. Doc. 81 at 191-236.

Petitioner's defense at trial was that he thought the Church has exclusive right to the insurance proceeds check and therefore that he lacked the intent to defraud. It is the jury's job at

trial to determine the credibility of the evidence, and the jury did not find the "good faith" defense credible. This was a reasonable conclusion based on the evidence presented by the Government.

This evidence, while circumstantial, provided a clear factual basis for the jury to conclude that Petitioner was aware of his wrongdoing and had the requisite intent to take and disperse monies of which he had no right. Even if Ross's appellate counsel had raised the sufficiency of the evidence issue on appeal, the Eleventh Circuit would not have reversed his conviction because the jury's verdict was reasonable. Therefore, counsel's decision not to challenge the sufficiency of the evidence was reasonable and Petitioner was not prejudiced by the decision.

3. **Whether trial counsel was ineffective for failing to call an insurance and mortgage expert to determine whether there was misconduct in cashing the insurance proceeds check.**

Petitioner's trial counsel was not ineffective for failing to call an insurance and mortgage expert at trial because trial counsel's decision was part of a sound trial strategy. The decision to call a witness, including an expert witness, is the "epitome of a strategic decision." Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995). The Supreme Court and the Eleventh Circuit have found that strategic choices are "virtually unchallengeable." Strickland, 466 U.S. at 690; Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998).  Trial strategy is trial counsel's course of conduct, which was neither prohibited nor required by law, for obtaining a favorable result for the client. Waters, 46 F.3d at 1512. Trial strategy and ineffectiveness is a question for the Court to decide, so affidavits or admissions of deficient performance by trial attorneys have no merit. Harris v. Dugger, 874 F.2d 756, 761 n.4 (11th Cir. 1989).

Petitioner has failed to show that a mortgage or insurance expert would have significantly aided his good faith defense at trial. Petitioner argues that a mortgage and insurance expert would have clarified the issue regarding the mortgage on the land upon which the Church's sanctuary stood, and established whether CB&T had a right to the insurance proceeds. Doc. 99 at 55. Petitioner's trial counsel thoroughly explored the issue of the separate tracts of land and the insufficient security deed on the CB&T mortgage, through cross examination of Government witnesses and through direct examination of defense witnesses. Counsel called a title search expert, as well as multiple witnesses, who stated that there was no deed to secure debt on the Rocky Creek Road tract. Doc. 81 at 14, 41. The Government did not dispute this evidence, although it presented evidence and testimony through the Alfa Insurance policy and CB&T that while the mortgage applied to the entire Church property despite the deficiency in the security deed. Doc. 80 at 25. Petitioner has failed to show that testimony by an expert would have added anything to the evidence in the record regarding Petitioner's subjective belief of at the time of the deposit. Because trial counsel made the reasonable, strategic decision to rely on the title expert and the lay witnesses to establish Petitioner's good faith defense at trial, counsel's performance was not deficient.

   **4.  Whether trial counsel was ineffective for failing to advise Petitioner the full scope and consequences of testifying at trial.**

In his fourth claim for relief, Petitioner contends that his trial counsel failed to provide him effective assistance by giving him incomplete advice about "the full risk and scope of consequences if he took the stand and testified." Petr.'s Brief 63 (Doc. 99). Based on the record of this case, Petitioner cannot meet either prong of the Strickland test to show ineffective assistance. First, Petitioner cannot show that his counsel's advice fell below an objective

standard of reasonableness because the record shows that Petitioner was fully aware that the decision to testify or not to testify was ultimately his decision alone and that his counsel advised him to testify as part of a reasonable and well-developed trial strategy.  Second, Petitioner cannot show that he was prejudiced by the impeachment evidence presented on cross-examination, because the record shows that most of the impeaching evidence had already been admitted in the Government's case.

The defendant in a criminal case has the right to decide whether or not to testify on his own behalf. United States v. Teague, 953 F.2d 1525, 1532 (11th Cir. 1992). The right to testify cannot be waived by anyone other than the defendant. Id. Additionally, the defendant cannot be compelled to testify. Id. It is the defense attorney's obligation to advise the defendant of the strategic implications of testifying or not testifying. Id. at 1533. Thus, although it is ultimately the defendant's decision whether to testify, it is trial counsel's job to advise the client whether to testify. Id. When deciding whether trial counsel was ineffective in recommending that defendant testify on his own behalf, the Court must not view trial counsel's performance through hindsight. See Waters v. Thomas, 46 F.3d 1506, 1513 (11th Cir. 1995). Accordingly, the Court must avoid second-guessing counsel's performance. White v. Singletary, 972 F.2d 1218, 1220 (11th Cir. 1992).

The record shows that Petitioner was fully advised that it was his decision and his decision alone to testify. Petitioner was present when the Court informed him and the jury multiple times that Petitioner did not have to testify. Doc. 79 at 5; Doc. 81 at 165-66. Petitioner's trail counsel even ensured that the Court inform Petitioner of his constitutional right not to testify even though she had already discussed the right with Petitioner before trial. Doc. 81 at 165-66.

20

Further, Petitioner told the Court that he discussed his right to testify with his trial counsel before trial and that his decision to testify was voluntary. Doc. 81 at 166. Nothing in the record indicates that Petitioner was coerced into testifying.

The record further shows that counsel advised Petitioner to testify as part of a coherent and reasonable trial strategy.  Petitioner's counsel presented a defense theory of good faith based on the belief that CB&T Bank did not have a valid mortgage on the Church property.  Counsel outlined this defense in her opening statement, in which she acknowledged that Petitioner knew that CB&T intended to call in its loan and knew that the check was not endorsed by CB&T when it was deposited at Security Bank.  According to this defense, Petitioner attempted to deposit the check without CB&T's endorsement because he and the Church board "wholeheartedly believed the money belonged to them, and they were going to do what it took to protect this money." Doc. 79 at 27.  Because this theory rested largely on Petitioner's frame of mind and intent, competent counsel could reasonably have determined that his testimony would provide significant support to the defense.  Petitioner's testimony also provided the opportunity to present evidence that the subsequent transactions with the funds were for Church purposes, even though many of the transactions appeared on the surface to be for personal expenses

Even if his counsel's advice and strategy could be considered deficient, the record shows that Petitioner was not prejudiced by his testimony and subsequent impeachment. Petitioner states that trial counsel recommended that he testify to explain the Government's evidence that Petitioner impersonated his grandmother on the telephone when opening an American Express account in her name. Doc. 99 at 65. Petitioner contends that trial counsel was ineffective for failing to inform him that he would be cross examined and impeached, that his criminal record

would be admitted against him, that an application for a home equity loan misrepresented Petitioner's income, and that the Church's website stated that the Church's roof had fallen because of damage from a storm, not a defect in the construction. Doc. 99 at 66.  These contentions are supported by an affidavit from Petitioner's trial counsel, who states that she advised Petitioner to testify "in order to explain an allegation that he impersonated his grandmother over the phone," but that she "did not fully explain the even when he testified to a limited scope of material, he could be impeached by any and all of the . . .information" concerning his criminal record and prior misrepresentations.  Petitioner now states that he would not have taken the stand "had [he] been aware that the jury's view of him was going to be tainted by his testimony and having to explain so many questions." Doc. 108 at 13.

The most significant impeaching information was already in the record before Petitioner took the stand, however.  Petitioner was aware that the jury knew of his prior criminal record before he testified. Doc.79 at 29. It was trial counsel's strategy to acknowledge Petitioner's criminal record during opening statement and to suggest that the Government has singled out Petitioner for prosecution because Petitioner had a record and was an "ex-con." Doc. 79 at 29. Counsel pointed out that the criminal record was a part of Petitioner's past and that he had since turned his life around.  Because the jury had been primed at the beginning of the case with knowledge of Petitioner's criminal record, Petitioner was not prejudiced when he was cross-examined regarding that record.

The record does not support a conclusion that the outcome of the trial would have been any different had Petitioner decided not to testify. The Government had already presented ample evidence, much of it uncontested, to lead the jury to convict Petitioner without Petitioner's

testimony. Petitioner was fully informed of his constitutional right whether to testify, and no one compelled him to testify at trial. Given the evidence presented by the Government, the decision to testify, upon advice of his counsel, was part of a reasonable trial strategy, an attempt to explain that the actions were taken in good faith and without criminal intent.

5. **Whether trial and appellate counsel were ineffective for not objecting to trial court's jury instruction that "Defendant presented the check from Alfa Insurance Company" after reading a stipulation to the jury.**

Petitioner contends that his trial and appellate counsel were ineffective for failing to object to a statement made by the trial court after reading a stipulation about the Church's repayment to CB&T Bank. After reading the stipulation, the court explained that the jury could consider the repayment "only to the extent that it is material to the Defendant's defense of good faith, and only to the extent that it may be evidence of Defendant's good faith at the time Defendant presented the check from Alfa Insurance for deposit at Security Bank." Doc. 80 at 16. Petitioner argues that counsel should have objected to the statement because it implied a finding that Petitioner had presented the check, an element of the Government's charge and a fact in dispute. Petitioner's claim of ineffective assistance fails both because Petitioner cannot show that counsel's performance fell below an objective standard of unreasonableness and because Petitioner cannot show that he was prejudiced by the remark.

In failing to object to the court's statement, trial counsel did not fall "outside the wide range of professionally competent assistance" described in Strickland. 466 U.S. at 690. The court's statement was an isolated remark prefacing a limiting instruction after reading a stipulation drafted by the parties. The remark about presenting the check was not repeated when the court repeated the stipulation during its final instructions to the jury. Doc. 82 at 162. The

question of whether Petitioner "presented" the check, although technically contested, was not a matter of significant dispute in the case. Petitioner conceded that he went to Security Bank with Undre Williams and Willie Ross to attempt to deposit the check. Undre Williams testified for the defense that he first handed the check to Security Bank's representative, Josh Jones, but stated that Petitioner went with Jones to the teller to deposit the check. Doc. 81 at 75. The Government presented a photograph of Petitioner at the teller counter with Josh Jones.  Doc. 79 at 70. Petitioner himself testified that he was present at the time of deposit, and that he received the deposit slip after the check was deposited. Doc. 181 at 187-88. Even with the benefit of hindsight, therefore, a competent trial attorney could have reasonably decided that the court's isolated statement about a fact not significantly in dispute did not merit an objection.

In the same light, appellate counsel did not provide ineffective assistance in choosing not to raise the issue on appeal.  The essence of effective appellate advocacy is in "winnowing out weaker arguments on appeal and focusing on one central issue, if possible, or at most on a few key issues."  Jones v. Barnes, 463 U.S. 745, 751-52 (1983).  Accordingly, effective appellate counsel "is not required to raise all nonfrivolous issues on appeal."  Payne v. United States, 566 F.3d 1276, 1277 (11th Cir. 2009).  Competent appellate counsel could have reasonably concluded that the court's isolated remark was unlikely to result in a reversal on appeal, and could have elected to focus on stronger arguments instead.

Even if Petitioner's counsel had been ineffective in failing to object to or appeal from the court's statement, Petitioner cannot show that he was prejudiced by his counsels' actions.  To show that a trial court's remarks on the evidence amount to reversible error, a defendant must show that the remarks "demonstrate such pervasive bias and unfairness that they prejudice one of

24

the parties in the case." <u>United States v. Verbitskaya</u>, 406 F.3d 1324, 1337 (11th Cir. 2005). "A single, isolated comment" is unlikely to demonstrate such pervasive bias.  <u>See</u> <u>United States v. Anthony</u>, 345 Fed. Appx. 459, 463 (11th Cir. 2009). In this case, the court's comment that Petitioner "presented" the check did not indicate any bias, but was merely a stray remark in the context of a limiting instruction, concerning a matter that was not central to the stipulation or to the defense.

Petitioner relies on the Sixth Circuit's decision in <u>United States v. Yates</u>, which found a court's comment improper because it "struck directly at the heart of [the defendant's] defense. 553 F.2d 518, 520-21 (6th Cir. 1977); Doc. 99 at 70. In <u>Yates</u>, the court found the court's comment to the jury that the defendant wrote a confession to be prejudicial when the defendant maintained that he did not write the confession. Petitioner argues that his case is similar to that in <u>Yates</u> because Petitioner testified he did not deposit the check. Doc. 99 at 71-72.

<u>Yates</u> fails to support Petitioner's claim of ineffective assistance. In contrast to <u>Yates</u>, in this case the court's statement did not directly contradict testimony by the defendant. Moreover, the court's comment in this case did not "strike directly at the heart of the defense" because the heart of Petitioner's defense was his theory of good faith, the argument that Petitioner did not have the requisite criminal intent when depositing the check. As such, Petitioner was not prejudiced by the isolated comment that he "presented" the check.  In the absence of prejudice or of objectively deficient performance by his attorneys, Petitioner cannot support his claim of ineffective assistance for failing to object to or appeal from the court's statement.

**6. Whether trial counsel was ineffective for failing to compel Josh Jones to submit to a handwriting sample.**

Trial counsel was not ineffective for failing to compel Josh Jones to submit to a handwriting sample. Petitioner contends that his counsel should have compelled Jones to submit to a writing sample and argues that it is "highly probable" that such a sample would have proved that Jones endorsed the check on behalf of CB&T. Petr's Brief at 75 (Doc. 99). Petitioner then argues that it is highly probable Petitioner would have been acquitted if Petitioner could have proved that Jones forged CB&T's endorsement. Petitioner has failed to show, however, that his counsel acted unreasonably in choosing not to compel Jones to submit a handwriting sample. Petitioner has also failed to present any evidence to show that he was prejudiced by the lack of a handwriting sample.

Petitioner's trial counsel effectively raised the possibility that Jones had written the endorsement for CB&T on the back of the check.  Counsel called a handwriting expert, Farrell Shiver, who analyzed the endorsements on the back of the check.  Shiver concluded that Undre Williams had written the endorsement for the church but could not determine who wrote the endorsement for CB&T Bank.  Shiver concluded that it was "highly probable" that the CB&T endorsement was not written by Petitioner, Undre Williams, Lucille Davis, or Rosa Mae Ross.[3] Petitoner's counsel also cross-examined Jones about his endorsement, with some effect.  Jones acknowledged on cross-examination that he had refused to speak with Petitioner's investigator and had refused to provide a handwriting sample.  Jones further acknowledged that he told counsel he "didn't give a shit" about the case.  Jones was fired by Security Bank for allowing the insurance check to be deposited.

---

[3] Shiver did not testify that he compared the endorsement to the handwriting of Willie Ross. Ross was deceased at the time of trial.

26

Competent trial counsel could reasonably have made the strategic decision not to compel a handwriting sample from Jones.  The testimony of the handwriting expert largely eliminated suspicion that Petitioner, Williams, Davis, or Mrs. Ross had signed the endorsement for CB&T. The defensive testimony of Jones on the stand, and his refusal to submit a sample voluntarily, were sufficient to raise serious doubt about Jones' involvement and to create a strong suspicion that Jones had in fact written the second endorsement on the check.  By compelling Jones to submit a sample, counsel would have run the risk of finding that Jones' handwriting also was not a match for the endorsement.  Competent counsel might reasonably have decided to take the safe bet, focusing on the reasonable doubt created by Jones' refusal to submit a sample.

Petitioner cannot show that he was prejudiced by the failure to compel Jones to submit a handwriting sample. Petitioner was charged not with forgery but with bank fraud. Even if Petitioner could have proven that Jones wrote the endorsement for CB&T, the jury could have concluded that Petitioner used Jones to aid and abet him in a scheme to defraud the bank. The Government acknowledged in closing argument that it was not charging Petitioner with forgery, but with "not having the permission of CB&T Bank to deposit that check." Doc. 82 at 140. The Government argued that Petitioner was aware that he needed such permission, after Alfa Insurance Corporation refused his request to remove CB&T from the check, after CB&T called and requested Petitioner to bring them the check, and after Magnolia State Bank had refused to deposit the check without permission from CB&T.  Although the question concerning Jones and his participation in depositing the check was raised as part of a reasonable defense strategy to create doubt about the events of the case, the question was not central to the Government's case or necessary to the jury's verdict.

**7.  Whether appellate counsel was ineffective for failing to raise the four-point role enhancement objection on appeal.**

Finally, Petitioner argues that his appellate counsel was ineffective for failing to raise the four-point role enhancement objection on appeal.  Petitioner has again failed to show prejudice, because the trial court made sufficient factual findings on the record to support the enhancement. U.S.S.G. § 3B.1(a) allows for a four-level enhancement when "the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive." The "five or more participants" theory requires the trial court to identify the participants. United States v. Mesa, 247 F.3d 1165, 1169 (11th Cir. 2001). The "otherwise extensive" theory does not require a set number of participants, but there must be at least one other participant in addition to the defendant. United States v. Holland, 22 F.3d 1040, 1045 n. 8 (11th Cir. 1994).

The court must make factual findings that the activity was "otherwise extensive." See United States v. Edison, 108 F.3d 1336, 1346 (11th Cir. 1997). Such a finding must consider factors such as the length and scope of the criminal activity and the amount of people involved. Id. A participant is defined as someone "criminally responsible for the commission of the offense, but need not be convicted." U.S.S.G. § 3B.1, comment; Holland, 22 F.3d at 1045. In deciding whether individuals were participants in the criminal activity, "the court must consider, in addition to the criminal act itself, the individuals involvement in the events surrounding the criminal act." Id. at 1046.

Relying on Edison, Petitioner contends that the trial court failed to make factual findings that the activity was "otherwise extensive." Doc. 99 at 79. Petitioner's case is distinguishable from Edison because the trial court did make sufficient factual findings, whereas the Eleventh Circuit concluded in Edison that the trial court had made no factual findings. 108 F.3d at 1346.

28

At Petitioner's sentencing hearing in this case, there was extensive discussion about Petitioner's role as an organizer or leader. Doc. 92 at 15-29. The trial court stated:

> in this case the Defendant at various times during the offense involved numerous people, including Willie Ross, Rosa Mae Ross, Undre Williams and Lucile Davis in the offense. Each of these individuals either received funds from the fraudulent scheme, and/or were directed by the Defendant how to dispose of the funds.

> Now once again I will tell you my position, and then give you the opportunity to resond. Clearly, clearly he was the organizer or leader and leader of the criminal activity in this case. He was the pastor of the church. He was very actively involved throughout this. Of course, one of the key propositions that shows leadership was he took that big check to the bank, and – but there were many other – there were many other propositions where he was the leader or organizer. For example, when he called to get the credit card in the name of his grandmother. So there are many other propositions like that. I'm not sure that I really need to express all those.

Doc. 92 at 16. After hearing argument from Petitioner's counsel, the court further observed:

> Pastor Ross didn't typically engage in this conduct by himself, the criminal conduct by himself. He did involve other people. He had somebody who went with him to the bank that day[4]…He involved his grandmother in this scheme to get the credit card. And I think there is other evidence to support that. But the reality of this situation is, and what seems to me can't be denied, is that this was a very extensive criminal enterprise.

Doc. 92 at 22-23. The record thus reflects that there were sufficient factual findings by the trial court to determine that Petitioner was a leader or organizer of criminal activity that involved five or more persons or was otherwise extensive. These findings were well supported by the evidence in the case.

Because appellate counsel chose to raise what he thought were stronger issues on appeal, appellate counsel's failure to object to the four-point enhancement was not deficient. Further,

---

[4] While the trial court did not specifically state the person's name, undisputed evidence shows the court was referring to Undre Williams.

because the trial court gave a sufficient factual basis for his decision, there was no error and Petitioner was not prejudiced by appellate counsel's decision not to raise the objection on appeal.

<u>**CONCLUSION**</u>

For the above reasons, IT IS RECOMMENDED that Petitioner's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 is **DENIED**. Pursuant to 28 U.S.C. §636(b)(1), the parties may serve and file written objections to this **RECOMMENDATION** with the district judge to whom this case is assigned **WITHIN FOURTEEN (14) DAYS** after being served with a copy thereof.

**SO RECOMMENDED**, this 19th day of October, 2011.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge